JONES et al. *vs* SIMS AND SCOTT.

1. It is a general rule of law, that the party *only*, in whom the legal interest is vested, can maintain an action for an injury done to property.

2. By a contract, in the ordinary form of a bill of lading, by which one man agrees to have received of another, some article of merchandise to be delivered to a third, who is to pay the freight—the title, by the shipment, *eo instanti*, passes to the consignee. But,

3. The bill of lading is not so conclusive, upon the question of ownership, as to prohibit the introduction, in some cases, of proof to that point.

4. One, interested in a steam-boat, as part owner, may sell his interest, without consulting the other joint owners.

5. The mere fact of being joint owners of a vessel, does not make the parties liable as co-partners—the liability of the owners is consequent upon its employment : and if the owners of a vessel are not concerned in its navigation, they cannot, upon the ground of ownership, be charged for the loss of goods, shipped on board of it.

6. But if they are entitled to its earnings, and jointly liable for its losses, they may be regarded as partners, so far as it relates to all liabilities incurred by the injury or destruction of the vessel.

7. If a joint-ownership be once shewn to have existed, its continuance may be presumed, unless it be proved that it has ceased.

In error to the Circuit court of Tuskaloosa.

Assumpsit against common carriers, for non-delivery, &c.

At the April term of the Circuit court of Tuskaloosa county, eighteen hundred and thirty-six, Edward Sims and David Scott, merchants and co-partners, complained of Wiliam Jones, jr., John Jones, Benjamin Horner and Larkin Hammond, survivors of John W. Donaldson, deceased, who, together with the said John W., were joint-owners and proprietors the steam-boat 'Warrior,' and co-partners in the freight of the said steam-boat, of a plea of trespass on the case, &c.,—for that defendants before and at the time of the promise and undertaking hereinafter mentioned, were the owners and proprietors, together with the said John W. Donaldson, since deceased, of a certain steam-boat called the 'Warrior,' and co-partners of the said John W. Donaldson, since deceased, in freighting on the said boat—then lying in the port of Tuskaloosa, and bound for Mobile, to wit, at the county aforesaid, whereof one Larkin Hammond was master : And thereupon plaintiffs, theretofore, viz: at a certain time mentioned, at the special instance and request of the said John W. Donaldson, since deceased, and of said defendants, surviving joint-owners, &c., caused to be shipped, and loaded in and on board said steam-boat, 'Warrior,' divers goods, wares and merchandize, to wit, one hundred bales of cotton, marked, &c.,—then in good order and well conditioned, of the value, &c. to be taken care of, and securely and safely carried and conveyed, by the said defendants, in and upon said steam-boat, from the port of Tuskaloosa, to the port of Mobile, and there to be safely and securely delivered in like good order and condition, for the said plaintiffs, (the dangers of the river only excepted,) unto Messrs M'Losky, Hagan & Co. or their assigns.   And in consideration thereof, and of certain freight and reward, to be paid by the said

M'Losky, Hagan & Co., or by the plaintiffs,.to wit, at so much per bale, the defendants undertook and promised plaintiffs to take care of, and securely carry, and convey and deliver, said cotton as aforesaid, (the dangers of the river only excepted.)    And although defendants received the cotton on board the steam boat, to be carried, and although a reasonable time for carrying had elapsed; yet defendants, nor John W. Donaldson, since deceased, being owners, &c., not regarding their duty, promise and undertaking; but, contriving, &c., did not take care of and carry said cotton so shipped, to the port of Mobile, and deliver the same to M'Loskey, Hagan & Co. or to their assigns; although no dangers of the river did prevent them from so doing.    But, on the contrary, so negligently and carelessly behaved themselves, with respect to said cotton, that, by and through their negligence and carelessness, and the improper conduct of the master of the boat, and of his hands and servants under him, in that behalf, the whole of the said one hundred bales of cotton became and were wholly lost, &c.

There were three other counts, in which the premises were charged in the same manner, with slight variations.    The fifth count charged, that defendants, together with John W. Donaldson, deceased, were the proprietors of a certain other steam-boat, called the 'Warrior,' and co-partners in freight on the said boat, which boat was employed in the carrying and conveying of passengers, freight, &c., on the Tombeckbee river, for hire : And whereas, by an act of the general assembly of Alabama, approved January twelfth, eighteen hundred and twenty-six, entitled "an act to regulate the navigation of certain rivers in this State, by steam-boats," it was declared, that it should not be lawful, from and after the passage of said act, for any steam-boat to ply for freight or passengers, between either of the ports of Mobile or Blakely, or any of the towns, landings or places, on either of the rivers,

Mobile, Alabama, Tombeckbee, or their tributaries—without previously having undergone a thorough survey and examination by the board of harbor-master and wardens of the port of Mobile, and been found, in all respects, staunch, well provided, and river-worthy, for the space of at least one year thereafter.—And by the said act, it was further declared, that the said board of harbor-master and wardens, should be (by the same) authorised and required, to make such survey and examination, at least once in every year, and oftener, if, in the opinion of the said board, the same might be proper. And, by the same act, it was further declared, that if, upon such survey and examination, the said board should be satisfied that the said boat, so examined, was staunch and well found, both in hull and machinery, and in all respects, well found and river-worthy, for one year thereafter, it should be the duty of the board to grant a certificate thereof, and to enter the same of record, in the port-warden's office. To which said act there was a section annexed, that if the owner, agent, consignee or master of any steam-boat, should, after the passage of the act, ply any such boat on any of the waters of the State, without having first obtained the certificate, such owners should severally be liable, for all damages which might accrue to property shipped, in consesequence of any casualty arising from the dangers of the river navigation, or from any accident to the engine or machinery of such boat. And that the plaintiffs, at the special instance and request of said defendants, had caused to be shipped and loaded, on board said steam boat, 'Warrior,' a certain other large quantity of cotton, &c., and that defendants did not deliver the same at Mobile; and that they never had obtained the certificate required by the act of the general assembly,—by which they became liable, &c.

To each of the counts there was a demurrer, and joinder of demurrer.

And at the September term of the same court, the parties came, and all and singular, the matters of law, arising upon defendants' demurrer to the plaintiffs' declaration, being seen, heard, and by the Court, fully understood, and mature deliberation thereupon had, it seemed to the court, that the declaration, and the matters therein contained, were not good and sufficient in law, for the plaintiffs to have and maintain their action against the defendants, and leave being given the plaintiffs to amend, by striking out the fifth count of their said declaration, upon the payment of costs, and the plaintiffs having amended as aforesaid, and issue being joined upon the other four counts of the said declaration, a jury thereupon came, who being sworn to speak the truth upon the issues joined, said they found in favor of the defendant, John Jones; and further, that they found in favor of the plaintiffs, against defendants, William Jones, jr., Benjamin Horner, and Larkin Hammond; and they assessed the plaintiffs' damages, by occasion of defendants' non-performance of the promise and assumption, in the declaration specified, at four thousand eight hundred and sixty-four dollars and twenty cents. It was, therefore, considered by the court, that the plaintiffs recover against said defendants, William Jones, jr., Benjamin Horner, and Larkin Hammond, surviving joint owners and co-partners of John W. Donaldson, deceased, their damages, aforesaid, in manner and form aforesaid, assessed, &c.

From this judgment, there was a writ of error to this court; and the bill of exceptions taken at the trial of the cause, stated:

That, on the trial of the cause, the plaintiffs, to prove and maintain the issue joined on their part, gave in evidence to the jury, a bill of lading as follows:

" Shipped in good order and well-conditioned, by Sims & Scott, on board the steam-boat, called the 'Warrior,' whereof L. Hammond is master, now ly-

ing at the port of Tuskaloosa, and bound for Mobile, to say: one hundred bales of cotton, (if any more on board, to be delivered,) being marked and numbered as in the margin, and are to be delivered in the like order and condition, at the port of Mobile, (the dangers of the river only excepted,) unto Messrs M'Losky, Hagan & Co., or to their assigns, he or they paying freight for the said cotton, at one dollar per bale, without primage and average accustomed.  In witness whereof, the master or purser of the said vessel, hath affirmed to three bills of lading, all of this tenor and date, one of which being accomplished, the others to stand void.   Dated in Tuskaloosa, the 20th day of January, 1829.                    John W. Donaldson."

The plaintiffs also gave the following evidence to establish the fact, that the defendants were joint-owners of the steam-boat, 'Warrior,' viz:

*Waddy Bacon,* a witness for them, deposed, that the steam-boat 'Warrior' was built two or three years before her loss, by several individuals jointly, and was brought out: that shortly after she was built and brought out, or about that time, he heard William Jones, jr. say that he was a part owner of her,—that he heard Benjamin Horner say he was part owner: that he heard either Thomas Jones or John Jones say he was part owner—(but which of these two last, he did not know or remember.)   Also, that he heard, about the same time, Sims & Scott say, that they were part owners.   He further said that he knew Larkin Hammond and John W. Donaldson, had purchased the interest of Sims & Scott in the 'Warrior,' about the time of the date of the agreement between them, as the witness was in Tuskaloosa at the time, and Hammond consulted him as to the policy of the purchase, and witness advised it.

*Henry A. Snow,* another witness, stated that the boat was built by a company, consisting of William Jones, jr., who contributed three-eighths; of Benjamin

Horner, who contributed one-eighth; of N. F. Cunningham & Co., who contributed one fourth; and of Sims & Scott, who contributed one fourth. That N. F. Cunningham & Co. sold their interest to Moses Sewall. That, since that time he did not know who were owners, and knew nothing further, as to ownership. This was all the evidence offered, of ownership.

The plaintiffs further proved, that cotton was worth in Tuskaloosa, nine cents per pound, and in Mobile, a cent and a half more, and that bales averaged generally, that season at Tuskaloosa, three hundred and thirty-five pounds in weight.

The plaintiffs further examined *Waddy Bacon*, *W. Holloway* and *John Richardson*, and proved, that shortly after the date of the bill of lading, the steam-boat 'Warrior,' on her trip from Tuskaloosa to Mobile, was lost in the Tombeckbee river, by running foul of the steam-boat, 'Erie;' and proved the usages of the river, &c.—and facts, conducing to prove that the loss was under such circumstances, as to render the carrier liable—and facts and circumstances, going to show, that the carrier was not excused, but was responsible for the loss, on the ground of negligence, &c.

The defendants gave in evidence, on their part, a bond or agreement, in writing, by the plaintiffs, and by Hammond and Donaldson, in the following terms:

"*State of Alabama,*        } Know all men, by these  "*Tuskaloosa County.* } presents, that we, Edward Sims and David Scott, of the first part, and John W. Donaldson and Larkin Hammond, of the second part, are held and firmly bound to each party, in the penal sum of seven thousand dollars, &c.

" The condition of the above obligation is such, that the said parties of the second part, have purchased from the said parties of the first part, one half of the steam-boat called the ' Warrior,' (and which is now

lying on the Black Warrior river,) with all her tackling, rigging and furniture, &c., for the sum of three thousand five hundred dollars; to be paid in freight, as follows: The parties of the first part shall have the right of shipping at each down passage of said boat, two hundred bales, or less, of cotton, at the lowest cash prices, by giving said parties or the agent of said boat, notice on the day of the arrival of said boat, of the number of bales they intend shipping; and that all over two hunnred bales are to be paid for, by the parties of the first part, in cash, to the parties of the second part. And it is further understood and agreed, by both the parties, that the parties of the first part shall further have the right of shipping as much up-freight as they may furnish, on board said boat, on the same conditions as expressed above. Each shipment, up or down, is to be charged to the parties of the first part, as payment in part, of said note of three thousand five hundred dollars. It is also agreed and understood, by each party, that if the said parties of the second part, refuse to receive freight, as above expressed, from the parties of the first part, upon application, or for so much as they are entitled to, by giving the notice above mentioned, then the parties of the first part shall have the right of charging interest on so much as would amount to the freight they were entitled to, until the parties of the second part comply with their engagement. The said parties of the second part also bind themselves as aforesaid, to insure the said boat, for the sum of four thousand dollars, in some good and solvent insurance office. And the policy of insurance from such office, is to be placed in the hands of the parties of the first part, as a further security for the payment of the said three thousand five hundred dollars. The said parties of the second part do further agree to pay the parties of the first part, for all the materials that they have procured to repair the said boat; and also to pay

6p  19

the expenses of the said boat, from the first of September instant.   The said parties of the first part do bind themselves, as aforesaid, (provided the said parties of the second part do pay as aforesaid, or cause to be paid, the said sum of three thousand five hundred dollars, to the satisfaction of the parties of the first part,) to make good and legal title to the parties of the second part, to the one half of the said steam-boat, as aforesaid, at the custom-house, in Mobile, or as soon as the parties of the second part thereafter may make demand.   Now, if the parties comply, this obligation to be void—otherwise, &c.   Signed and sealed."

The defendants also gave in evidence a record of a suit in this court, wherein Sims & Scott were plaintiffs, and Larkin Hammond and John W. Donaldson were defendants.   This suit was an action of assumpsit, commenced on the twenty-third of September, eighteen hundred and twenty-nine, and was to recover on an instrument of writing, as follows :

"$3,500 00.—From the first day of December next, until the first day of June following, we promise to pay Sims & Scott or bearer, thirty-five hundred dollars—to be discharged in freight, during the ensuing winter and spring, at the lowest cash prices.   Value received, this 9th day of September, 1828.

"Jno. W. Donaldson.
"Larkin Hammond."

This suit was on the eleventh of October, eighteen hundred and thirty-two, determined as follows : a demurrer of defendants to the declaration of the plaintiffs, was sustained, and leave given the plaintiffs to amend ; which they declined doing, and thereupon they took a non-suit.

It was further proved, that previously to the sale by Sims & Scott, of their interest to Hammond and Do-

naldson, Hammond was the captain of the Warrior, and Donaldson was the clerk: that they had been so for some time previous, and continued in the same stations after the sale, and until the time of the loss. It was further proved, that Sims & Scott were a wealthy firm, and were men of responsibility, residing in Tuskaloosa: that the defendants Jones and Horner were so likewise, residing in Mobile ; and that Larkin Hammond and John W. Donaldson had no property whatever, except their interest in the Warrior, and were not otherwise responsible persons : Also, that the Warrior was at Tuskaloosa, when the sale was made by said Sims & Scott, and that she was on her second or third trip down to Mobile, when she sunk, after the sale to Hammond and Donaldson. There was no other evidence offered of the shipment of the cotton, than the bill of lading, and no other evidence offered of the title to the cotton, or whose property it was, except the production of the bill of lading, which was given as aforesaid.

There was no evidence of any partnership, between the defendants, or any of them, except such as might in law, arise, from the proof of the joint-ownership, as stated above ; and there was no evidence, that William Jones, jr., or Benjamin Horner had notice, or that they knew of the transfer made by Sims & Scott, to Hammond and Donaldson, except the presumption arising from the terms of the sale.

The foregoing was all the evidence introduced on the trial of the cause, and upon that evidence the defendants requested the court to charge the jury :

1. That if the jury should find, that there was no other evidence of title or ownership of the cotton, in Sims & Scott, than that arising from the bill of lading, the action could not be sustained in their name.

2. That if the jury found that there was no evidence that William Jones, jr., and Benjamin Horner had notice of the sale of the interest of Sims & Scott,

to Hammond and Donaldson, they could not be considered, as chargeable as co-partners with them in this case, in freighting; and that if they were not such co-partners, the plaintiffs could not recover against them.

3. That if the jury should believe, from the evidence, that the cotton was shipped under the special agreement made with Hammond and Donaldson, and that the amount of freight should go in discharge of the debt incurred upon the purchase of the interest of Sims & Scott, in the boat, the defendants, Jones and Horner would not be responsible for the loss.

4. That if the jury believed that Sims & Scott sold to Hammond and Donaldson, their share in the boat, as specified in the bond or contract, and that they shipped the cotton, on the boat, under the agreement for freight, and that this was unknown to the other owners, no visible change appearing in the officers of the boat, or her condition—the plaintiffs could not maintain their action against the defendants as charged.

5. That if the jury believed that there was no other evidence of co-partnership in freighting, than that arising from the proof of joint-ownership, they should find for the defendants.

All of which several instructions the court refused to give; and did instruct the jury—

That the bill of lading, in this case, was sufficient euidence of the title, in this action, to the cotton, to enable them to maintain an action in their own names:

That Sims & Scott had the full right to sell their share in the said steam-boat to whom they pleased, and that they were not bound to give to the other joint-owners, any notice of such sale, there being no evidence of their being under any contract restraining them from so doing.

That having sold their interest to Hammond and Donaldson, as shewn by the contract in writing, or bond, they stood in the same light as strangers, in all

respects; and that having shipped cotton, the defendants were liable to them, if liable at all, precisely as they would be to any other shippers or freighters, notwithstanding the particular nature of the sale, or that Jones and Horner had no notice of the said sale.

That the defendants were chargeable as co-partners, by reason of their being joint-owners; and that the liability to be charged as co-partners, was the consequence of their joint-ownership, in respect to the freight and liability for losses, without any further or special evidence of co-partnership.

The defendants objected to the sufficiency of the evidence of their being joint owners, as to Jones and Horner, on the ground, that they were shewn to be owners at a previous time, and not proved to be so, at the time of the shipment and loss. But the could ruled, that the plaintiffs, having proved their joint-ownership at a previous time, it was incumbent on the defendants to shew that their ownership had ceased.

To all which opinions and decisions of the conrt, and refusal to instruct the jury as requested by the defendants, the defendants excepted, &c.

And the plaintiffs in error, at the present term, assigned for error—

1. That the court below erred, in refusing to give the several charges asked to be given, and also in the several charges given, which ought not to have been given.

2. Judgment final should have been rendered for the defendants on the demurrer, and the court erred, in permitting plaintiffs to amend their declaration, by striking out the fifth count.

3. The jury having rendered a verdict for John Jones, one of the defendants below, judgment should have been rendered for all the defendants.

4. The court erred, in rendering judgment against William Jones, jr., Benjamin Horner, and Larkin Hammond, part of the defendants, on the verdict of the jury.

*Peck,* for the plaintiffs in error, contended—

1. The plaintiffs were consignors, and gave in evidence a bill of lading, but no other evidence of title to cotton shipped, and there was no rule of law clearer, than that the action should have been brought by the consignees.—1 Peters's Rep. 386, 445; 1 Ch. Pl. 6, 7; 5 Petersdorff, 167; Jones on Bailments, 107, H. & I; 6 Serg't & Rawle, 429; 5 English Common Law Rep. 283.

2. The Court below had charged, that joint-ownership in a vessel, made plaintiffs partners, *per se,* without any other evidence of partnership; and plaintiffs insisted the charge was erroneous, and that they were not liable, as co-partners in the action.—14 Johns. Rep. 318; Gow 5, 270; 17 Johns. 535; 3 Kent's Com. 16, 17, 151, 154, 155; 15 Mass. 370; 1 Johns. Rep. 112; 6 Pickering, 335; Collyer on Partnership; 2 Ves. & Bea. 244; 20 Johns. Ch. Rep. 636.

3. There was no sufficient evidence of defendants, Jones & Horner's being part owners, at the time of the loss. The only evidence offered, was that several years previous to the loss, they admitted they were part owners, which the court ruled to be sufficient, and now the plaintiffs in error contended, that it was necessary to have proved them owners and copartners at the time of the loss, or they could not be liable in this action.

4. It appeared also, there was a special agreement between the defendants in error, with Hammond and Donaldson, by which the defendants had sold to Hammond and Donaldson, one half the boat which they owned before that time, and by the special agreement, were to be paid in freight. Plaintiffs in error, therefore, contended, that inasmuch as that was a contract made by Sims & Scott, with Hammond, who was master, without the knowledge of Jones and Horner, and not within the scope of his authority, as master, it

should be considered as a contract of the master only, not binding on the owners—and Hammond and Donaidson, alone, liable for its performance.—15 Mass. 372, 3 ; 1 Johns. Rep. 111; 14 Johns. Rep. 318 ; Gow 5, 270 ; 17 Johns. Rep. 535 ; 1 ib. 112, 114; Abbot on Shipping, 98 ; 1 Taunt. 391; 2 Wash. C. C. Rep. 297; 19 Johns. Rep. 235 ; 11 Mass. Rep. 99; 2 Camp. 529; 4 Pickering, 456 ; 3 ib. 495, 501, 503.

5. There being a verdict for John Jones, one of the parties charged on a joint contract, judgment should have been for the defendants.—Abbot on Shipping, 82, 83.

6. Judgment should have been final for the defendants on the demurrer.—First, because there was a misjoinder of liabilities, in charging the defendants as joint-owners and as co-partners ; and second, because some of the counts were in assumpsit, and some in case—which misjoinder was not amendable, &c.— *School Commissioners vs Aiken*, in this court ; 1 Ch. Pl. 548 ; Gould on Pl. ch. 4, 98, page 219.

*Porter*, for the defendants—did not feel disposed to argue such of the points in the case, as had already been determined in the case of *Pitcher vs. Jones*, and passed upon by the opinion of the court. That case, he apprehended, had determined every point which arose here, with the exception of three positions taken by the plaintiffs in error, which he should immediately advert to, and which were—

First.—The conclusiveness of the bill of lading.

Secondly.—The right of defendants in error, as consignors, to bring the action.

Thirdly.—The striking out of the fifth count in their declaration.

1. The question of the right of Sims & Scott, to bring the action in this case—they being the consignors of the cotton lost—merged in it, that in relation to the bill of lading. If, as consignors, the suit was well

brought, it surely resulted that the bill of lading was conclusive : it was the highest evidence of the con-- tract between the parties : it was executed to the plaintiffs below, by the defendants; and stipulated for the performance of an act, of which it only was the proper and conclusive evidence—because the best. If Sims & Scott should be held capable of maintaining the action, brought by them, they must prove the contract on which the action is founded : and they could not sustain it by parol, so long as the bill of lading was in existence. Under the bill of lading, no rights attached to the consignee, if the latter had no claim to the goods stipulated to be conveyed : but if exclusively entitled to the action here, the bill of lading would be the best evidence of his right to receive them ; and in cases where he might have his action for the goods, such action could not be sustained, but by the production of the bill of lading, or proof of its contents, if lost.

Again : All suits founded on written agreements, to do a particular act, must be sustained by their production, if not detroyed. The principle that *parol* will not establish *written* evidence of contracts, was one of the admitted maxims of jurisprudence. Then, was not a bill of lading the written evidence of the contract to convey goods for hire? If it be, then such written testimony must be sued on in the name of him to whom executed. Hence, it resulted, that the admissibility and conclusiveness of a bill of lading, like all other written contracts, depended upon the person who brought the action ; and the right of any one to bring it. That it would be conclusive, in actions brought by the proper party, is apparent, from numerous authorities.—1 *Saund. P. & E.* 329—*Brown vs. Hodgson,* 2 *Camp.* 36—2 *Starkie's Ev.* 637—*Strange,* 1127—3 *Taunt.* 305:—Where, upon a policy of insurance, bill of parcels is conclusive. If then, where one had the right to sue, the bill of lading would be

conclusive, he was brought to the point, whether in this case, the proper party had sued.

2. The question whether the consignor or consignee of goods shipped, had the right to sue generally, was one not yet settled by the authorities so numerously thrown into the scale on either hand. The courts, in fact, so variant were the decisions, had refused of late years, to moot the question as a general one; or to decide it by numbering the strength of authorities; and had invariably determined it, in reference to the particular circumstances of each case. If, however, it was to be determined here, by the preponderance of authority,—he presumed defendants could array a number equal to that of their opponents. If to be determined according to the customs of the mercantile community, as recognised by the English courts, then he thought, they could shew, that commercial customs deserve an adjudication favorable to defendants. If to be decided upon the merits of the case, defendants could shew they were within a rule which would sustain the action.

In the case of *Potter vs Lansing*, the whole law, upon this subject had been reviewed, by a jurist of our own country; and the general doctrine pervading the entire decisions, established the principle, that it was necessary to bring an action for goods lost, in the name of the consignee, only in cases where the goods reach the destined port, where the consignee resides; and the consignee has some special interest in the goods shipped to him. Some special interest, to be sure, would be presumed, where the goods were shipped for, and on account of the consignee, he paying freight, and where that appeared in the bill of lading. But it had invariably been held, in the English courts, that where it *prima facie* appeared that the consignor was the owner, the freight was to be paid by him; and that where there was a privity of contract between the consignor and the freighter, then the rule had always

6p            20

been to require the action in the name of the consignor. In cases where the courts had presumed an interest in the consignee, it had been *ex necessitate rei* : where it appeared that the consignor resided beyond seas, and that the consignee was the usual agent : and even there the courts would require some shewing, that the consignee had a right, from the face of the contract, to sue—and to that effect were numerous authorities,—1 Saun. P. and Ev. 318; 1 Johns. Rep. 215; 6 Cranch, 338 ; 17 Johns. 234; 4 Mass. 115; 7 ib. 297; 2 Saund. Evid. 200; 1 Johns. 229; 1 ib. 1; 8 Cranch, 317, 327, 328; 9 ib. 183 ; 8 ib. 359 ; 1 Wheat. 25 ; 1 ib. 208, 212 ; 6 Serg't. & Rawle, 429 ; 5 Burr. 2680 : 1 D. & East. 659 ; 5 ib. 649 ; 3 Camp. 321; 12 Mod. 156; 3 Salk. 290 ; 3 Barn. & Ald. 277; 1 Camp. 369 ; 8 T. R. 330 ; 3 Bos. & Pul. 584; 3 Selw. 339; 2 Saund. 47; *Moore vs Sheridine*, 2 Har. & M'Hen. 453 ; *Shalzel vs Hart*, 2 Marsh, 192 ; *Ferguson vs Chappel*, 3 ib. 401.

But, throwing aside, from an influence in the case, the weight of authorities, and how stood the question, on the reasoning of the commercial law.— Commercial rules must depend, for their construction, on reason, and that reason must be applied to the usages and necessities of each community. There would be little reason in settling a question here, upon the commercial law of England, if that law would be entirely inapplicable to the usages of this country. There were then, no such relations existing in any of the commercial countries of Europe, as existed here. The consignors and consignees of produce, in this country, were *sui generis*. Here, the consignors of produce were almost always the owners. Not so, the consignee of goods *to* the interior.

In the latter case, the goods shipped to the interior, were purchased, and shipped for and on account of the consignee; and the produce received from the interior, was received for and on account of the consignor, who was the owner : and if sold by the consignee,

the sale was made only in the capacity of a factor, and the proceeds placed to the credit of the consignor.— Here, the consignee of produce was always the mere receiving and forwarding agent of the consignor— having no interest either direct or contingent, in the article shipped to him. But this was, by no means, the relation existing in Europe. There, there were no classes of receiving and forwarding agents, as with us, from the interior to the sea-port; and every shipment made was of goods purchased by the consignor, for the use of the consignee: hence, the interest that vested in him, and rendered him the proper person, to bring the action.

In every decided case, so far as his discovery went, where the principle had been determined, that the consignee should bring the action, the consignor had invariably been the purchaser for the consignee: and no case, he thought, could be adduced, where the right of action had been thus held, when the matter consigned, had been produce from the interior, shipped for the mere object of a sale by the consignee.— According to all custom and all law, the suit ought to be in the name of him in whom vested the legal interest. That interest had been determined to vest in the consignee, wherever the consignor made the purchase for him, and shipped at his risk, and to his account. But, it never had been held, that any interest vested in a factor, receiving produce from the owner, only so far as its protection from the act of strangers would be concerned, *in the absence of the owner*. And that interest determined as soon as the owner was in a situation to take care of his property. If sold, the proceeds were a trust fund, which might be attached by the owner; and the factor could pass no legal estate, except through instructions, derived either impliedly or expressly, from his principal.

If, however, in order, to maintain an action, it be necessary for the consignor, to shew the whole inter-

est in himself, and none in the consignee, by the cir-cumstances of each particular case, then, defendants contended, that this was one of a description which conclusively shewed these facts. The cotton was shipped to the consignee, as a mere factor for, and on account of the consignor, the owner. Through all the circumstances of the case, ran the positive recog-nition of the parties, that Sims & Scott were the own-ers. But, the most material fact was, that Sims & Scott were alone responsible for the freight. And, in fact, no presumption existed, but that the whole en-tire interest was in Sims & Scott, and that none vest-ed in the consignees;

In the third place, as to striking out the fifth count. If the count was wholly foreign to the cause of action, the demurrer was not proper. The motion ought to have been to strike out.—1 Term Rep. 274 ; 2 Saund. 117, note e, n. 2 ; 1 Wilson, 248 ; 2 ib. 321; 4 Stewart & Porter, 328 ; 12 Petersdorff, 650 ; 9 ib. 375 ; 12 ib. 13. If the plea was not wholly inapplicable to the action, then this court would not control the discre-tion of a court below, as to amendment.—*Jennins vs Newman*, 4 Term Rep. 347 ; 12 Petersdorff, 650 ; 9 ib. 375, 404 ; *Curtis vs Davis*, 2 Lev. 110 ; 2 Caine's R. 216 ; 1 Chit. P. 229, 231, 236 ; ib. 44 and notes.

COLLIER, C. J.—The questions of law presented in this case, arise mainly out of the judgment, upon the demurrer of the plaintiffs in error to the declaration of the defendants, and a bill of exceptions taken at the trial.

The bill of exceptions sets out a bill of lading sign-ed by the master or purser of the steam-boat Warrior, from which it appears that the defendants shipped from Tuskaloosa on that boat, bound thence to Mo-bile, to Messrs M'Losky & Hagan, (at the latter place,) one hundred bales of cotton, the consignees paying freight therefor, at one dollar per bale.

It was proved, that the 'Warrior,' with her cargo,

was lost in the Tombeckbee river, on her downward passage, by a collision with the steam-boat 'Erie,' under circumstances of negligence, on the part of the officers of the former boat.

It was shewn that the plaintiffs in error were the owners of the 'Warrior,' and that the defendants had been part owners of that boat, until some time previously, when they sold their interest therein to the plaintiffs, Hammond and Donaldson, for thirty-five hundred dollars, payable in freight: That Hammond and Donaldson stipulated with the defendants, that they might ship as much as two hundred bales of cotton, on the 'Warrior,' each downward passage to Mobile, and pay the freight by crediting the amount thereof, on Hammond and Donaldson's note, for the purchase of their interest in the boat.

The plaintiffs in error moved for several instructions by the judge to the jury, which it will be unnecessary to notice, as they sufficiently appear in the instructions given.

The court instructed the jury—

1. That the bill of lading was sufficient evidence, that the defendants were the owners of the cotton shipped by them, to entitle them to an action for its loss.

2. That the defendants without some contract to restrain them, had the right to sell their interest in the 'Warrior,' to whom they pleased, and that they were not bound to give notice of a sale to the other joint-owners.

3. That, having sold their interest to Hammond and Donaldson, as shewn by their contract in writing, they stood in the same light as strangers in all respects,—and that having shipped cotton, the plaintiffs in error were liable, if at all, precisely as they would be to any other shippers or freighters, notwithstanding the terms of the contract of sale, or the want of notice to Jones and Horner.

4  That the plaintiffs in error being joint-owners, were chargeable as co-partners, and their liability to be thus charged, was a consequence of their joint-ownership, in respect to freight and liability for losses.

5.  The plaintiffs objected to the sufficiency of the evidence of Jones and Horner's being joint-owners, on the ground that they were shewn to be owners at a previous time, and not proved to be such, at the time of the shipment and loss.   The court, however, decided, that their joint-ownership being shewn to have once existed, it was incumbent on the plaintiffs, to shew that it had ceased.

The jury found a verdict in favor of John Jones, and against the other defendants in the Circuit court, and judgment was rendered in pursuance to their finding.

1.  The instructions given by the judge of the Circuit court to the jury, upon the first point, were doubtless founded upon the assumption, that the right of property remained with the consignor.  For it is a general rule of law, that the party *only*, in whom the legal interest is vested, can maintain an action, for an injury to property.*

That the contract between the consignor or shipper and the carrier of goods, may be so framed as to continue the property in the former, can not be questioned; but if the contract be in the ordinary form of a bill of lading, by which one man agrees to have received of another some article of merchandize, to be delivered to a third, who is to pay the freight, the title by the shipment, *eo instanti*, passes to the consignee.† *Dutton vs Solomonson;*‡ *Mussen vs Price et al.;*§ *Brown*

---

* Jeremy's Law of Carriers, 123 ; Jones on Bailments, 107, h.
† Jeremy's Law of Carriers, 94.
‡ 3 Bos. & Pul. 583.
§ 4 East. Rep. 147.

*vs Hodgson;\** *Cook vs Ludlow;*† *Godfrey vs Furzo;*‡ *Snee vs Prescot;*§ *Groning vs Mendham;*‖ *Sargent vs Morris;*¶ *Joseph et al. vs Knox;\*\** *Potter vs Lansing.*††

In *Dawes vs Peck,*‡‡ the King's Bench determined, that the right of property, on which the action to recover for a loss is founded, can not be allowed to fluctuate, according to the choice of the consignor or consignee, so that either of them may maintain an action against the carrier, for a non-delivery of goods. The legal right must be certain, and depend upon the contract of the parties, and that if a consignor has placed goods in a course of transportation, according to the consignee's directions, the right to them vests in the latter. And to show how strict the rule is on this subject, *Griffin vs Langfield et ux,*§§ may be cited, which was an action for goods sold to the wife *dum sola,* who came of age September the twentieth. The goods were delivered to a carrier, for her, on the eighteenth, and reached her on the twenty-first—and it was said by Lord *Ellenborough,*—"When the goods were delivered to the carrier, the property vested in the defendant, and she might immediately have been sued for their value. Therefore, as she was under age on the eighteenth, the action can not be supported."

In *Conard vs The Atlantic Insurance Company,*‖‖ it was considered that no person but the consignee, *strictly speaking,* could transfer, by an *indorsement* of the bill of lading, the legal title to the goods.—That the shipper, if he be the owner, and the shipment be made on his own account, can not, by *a mere indorse-*

---

\*2 Camp. R. 36.    ¶3 Barn. & Ald. 278.
†2 New R. 119.    \*\*3 Camp. R. 320; 7 Taunt. R. 59.
‡3 P. Wms. 185-6.    ††1 Johns. R. 215.
§1 Atk. R. 248.    ‡‡8 T. R. 330.
‖5 M. & S. 189.    §§3 Camp. R. 254.
‖‖1 Peters, 386.

*ment* of the bill, pass the legal title; unless he is the consignee, or the goods be deliverable to his order; yet he may do this, by an assignment *thereon,* or by a separate instrument.    This conclusion is founded upon the legal notion, that the bill of lading upon its face, indicates the consignee as the owner of the goods, it refers to.

In *Griffeth vs Ingleden,*\* the action was brought by the consignee of goods against the owner of a vessel, on which they were shipped, to recover damages, for an injury they had sustained by negligence in their carriage.    The bill of lading stated that the freight was "to be paid in Liverpool," the place of the shipper's residence ; yet the action was held to be well brought.    *Tighlman,* Chief Justice, in the opinion which he delivered, says, "In deciding on the legal property, the court will look to the bill of lading ; but in ascertaining the equitable owner, the invoices, letters of advice, and other collatteral evidence *will be* resorted to."    He cited *Evans vs Martlett,*† in which the court lay down the rule, "that if goods are, by bill of lading consigned to A, he is the owner, and must bring the action against the owner of the ship, if they be lost ; but if the bill be special to be deliverered to A, for the use of B, B ought to bring the action ; but, if the bill be general to A, and the invoice shows they are on account of B, A ought to bring the action, for the property is in him, and B has only a trust."

And even as early as 1690, in *Wiseman vs Vandeputt,*‡ the question arose in Chancery, between the consignor of goods, and the consignee, who had not paid for them, as to who was the legal owner.    It was referred to a court of law for decision, and was there

---

6    Serg't. & Rawle, 429.        † 1 Ld. Raym. 271 ; 12 Mod. 156.
‡ 2 Vern. Rep. 203.

determined in favor of the consignee; and the Chancellor determined that it was allowable, in equity, for the consignors to get the goods again, into their hands, or to prevent the consignee from receiving them.

In some of the cases, stress is laid upon the direction of the consignee, to send goods by a particular person or conveyance, upon the supposition, that where specific directions are followed by the consignor, the delivery of goods to the carrier, vests the title in the consignee. But, upon principle, as well as authority, it is believed, that this circumstance can have no influence in determining who is the legal owner;[*] *Vale vs Bayle.*[†]

If goods are directed to be sent to any particular place, and the mode of conveyance, the person or the vessel, by whom they are desired to be sent, are not pointed out by the consignee, it must be understood that the consignor has a discretion entrusted to him, restrained only by the adoption of some one of the most usual modes of conveyance. And that in either case, whether the shipment be made under special directions, or the discretion of the consignor, a legal right of property vests in the consignee, upon delivery to the carrier, who becomes the consignee's agent.[‡]

It will follow, from what has already been said, that no act need be done by the consignee, in order to invest him with the legal title—that the bill of lading, (if this be the only evidence offered, to the point,) will be decisive, and supposes every thing that is essential to complete the consignee's right.

Notwithstanding property is thus absolutely vested in the consignee, by delivery to a carrier, there yet remains with the consignor, the right of resuming it

---

[*] 4 East. Rep. 147, supra.
[†] Cowp. 294; 3 P. Wms. 185, 6; 1 Atk. Rep. 248 : 2 New R. 119; 3 Bos. & Pul. 582.
[‡] Jeremy's Law of Carriers, 94.

again, under some circumstances, before it actually gets into the possession of the consignee. This is called the right of *stoppage in transitu,* and when exérted, revests the property in the consignor, as much as if he had never parted with the possession. This right was originally adopted in courts of Equity;* and being founded upon principles of equity and natural justice, is now established in courts of law.† It is ex- ercised when goods have been sold and not paid for, by reason of credit being given or otherwise, and the vendee, to whom they have been consigned, becomes insolvent—and, as its designation indicates, exists on- ly during the *transit* of goods, and ceases when they come into the possession of the buyer.

Whether the fact of the consignor's stipulating with the carrier to pay him freight, constitutes such a fea- ture in the bill of lading, as continues in the consign- or the legal title to goods, is a question upon which there is not uniformity in judicial decision;‡ *King et al. vs Meredith;*§ *Davis & Jordan vs James;*|| *Moore vs Wil- son.*¶ And in as much as it can not be material, in the ulterior progress of this case, to decide it, we will leave it for future adjudication.

Having shown, that where a carrier undertakes, by a bill of lading, to deliver goods to a consignee, he pay- ing freight, the legal title, immediately upon their re- ceipt, vests in the latter, let us inquire *whether this* is a conclusion of law, or whether it is not rather a pre- sumption, subject to explanation, and to be removed by proof.

In *The Maryland Insurance Company vs Ruden's ad- ministrator,*** it was held, that the bill of lading was

---

*1 Atk. R. 245; 2 Vern. R. 203; Ambler's R. 399.
†8 D. & E. 334, by Grose, Justice, and 5 East. 180.
‡6 Serg't & Rawle. 429.
§2 Camp. R. 639; 3 Camp. R. 321; 8 D. & E. 330.
|| 5 Burr 2680.
¶1 T. R. 659.                    **6 Cranch 332.

not conclusive as to the ownership of goods. In *Conard vs the Atlantic Insurance Company*,[*] it was determined, that the shipper, *if he be the owner, and the shipment be on his own account and risk*, may, by an assignment made on the bill of lading, or a separate instrument, pass the legal title to goods. And to the same effect is *De Wolf vs Harris*;[†] *Nathan vs Giles*;[‡] *Moore vs Sheredine*.[§] As to the inconclusiveness of a bill of lading, see also, *Barrett et al. vs Rogers*.[||]

The inference from these cases, is, that the bill of lading is not so conclusive upon the question of ownership, as to inhibit the introduction of all proof to that point. This is deducible, from the right of a *shipper, on his own account and risk*, to make an assignment of a legal title to goods, though the bill of lading *prima facie*, pointed to the consignee as entitled to them; for, as he can transfer no other title than he had, to pass the legal property, he himself must have retained it, notwithstanding the consignment.

But, if this question was *res integra*, we might call, in aid of our conclusion, the usage of trade. It is well known, that in a majority of instances, where country produce is shipped from the up country, to market, the shipment is made on the account and risk of the shipper,—that the consignee is merely his factor or agent, with instructions either to sell or re-ship. Such being the course of trade, it should have a powerful influence in determining our judgment, if the question was one of doubt.

2. The right of the defendants to sell their interest in the 'Warrior,' to Hammond and Donaldson, was determined affirmatively, in *Jones et al. Pitcher & Co.*[¶]

---

[*]1 Peters, 445.　　　　　[§]2 Har. & M'Hen. 453.
[†]4 Mason, 515.　　　　　[||]7 Mass R. 297.
[‡]5 Taunt. 558.　　　　　[¶]3 Stew. & Porter, 168.

a decision, which, on this point, we are willing to follow.

3. It was, doubtless, intended, by this exception, to raise the question, whether the plaintiffs could be charged for a loss by the defendants, in their shipment of cotton, in as much as Hammond and Donaldson had stipulated with them, that they might ship as much as two hundred bales on the 'Warrior,' each downward passage, and pay the freight by giving them a credit for the amount thereof, on their note for the purchase of the defendants' interest in the boat.

This question, we, think, is not presented by the evidence recited in the bill of exceptions.

It is not pretended that the shipment was made under the stipulation contained in the contract of sale; the plaintiffs deny that it was made on account of the defendants—and, the bill of lading, which is certainly *prima facie* evidence of what it contains, vests the legal title in the consignee, and requires the freight to be paid by him. The question is then, abstract from the proof, whether the defendants are, by their contract, confined to the liability of Hammond and Donaldson, or may also charge the other joint owners with them,—and, being abstract, we waive its examination, the more especially as it was not discussed in the argument.

4. The mere fact of being joint-owners of a vessel, does not make the parties liable as co-partners : the liability of the owners is consequent upon its employment. And if the owners of a vessel are not concerned in its navigation, they can not, upon the ground of ownership, be charged for the loss of goods shipped on board of it; but if they are entitled to its earnings, and jointly liable for losses, they may be regarded as partners, so far as it relates to all liabilities incurred by the injury or destruction of the vessel.—*Jones et al. vs*

*Pitcher & Co.** And this we understand to have been the charge of the Circuit judge, to the jury, though it is not so clearly stated in the bill of exceptions as could have been desired.

5. There is no error in this charge to the jury, that if the joint-ownership of Jones and Horner was shown to have once existed, its continuance may be presumed, unless it should be proved that it had ceased.— This is clearly in accordance with the analogies of the law, and does not impose a task of difficulty upon the plaintiffs; for if there had been a severance of interest, or a sale of a joint-interest, it might be shewn either by documentary proof, by parol evidence, positive in its terms, or else by a state of circumstances, incompatible with a continued ownership.

It is insisted, that the judgment on the demurrer to the declaration should have been final,—that there being a mis-joinder of counts, no amendment was allowable: We think differently; and have no doubt but our statutes of amendment authorised a new declaration to be filed in confirmity to the writ.

It was clearly regular, to render a judgment against the defendants, who were charged by the verdict of the jury, though one of them was discharged. Joint-owners of vessels are clearly embraced within the equity of our statute of eighteen hundred and eighteen, in regard to partners.†

Having considered all the questions properly presented in this case, our conclusion is, that the judgment must be reversed and the cause remanded.

---

*3 Stew. & Porter, 135.          †3 Stew. & Porter, 135.