## ROBERT ANNETT v. DAVID FOSTER.

Where a vessel was attached to a wharf by a line lying for most of its length beneath the water, and at such a distance from the wharf as to leave ample passage-way between it and the wharf for vessels to pass to and fro, but no person was on deck to loosen the line or warn vessels attempting to pass,— *Held*, negligence which rendered the owners liable for any damages resulting therefrom.

The relation of master and servant between the owner and master of a vessel and the liability of the former, as owner, for negligence in its management does not cease unless the owner has given up all control of the vessel and of her employment, and all immediate and direct interest in the freight earned by her. Hence, where the agreement between the owner and master of a vessel was that the former should make contracts for, and receive the freight, and pay wharfage, and the master should receive a share of the freight money, and pay all other expenses, and be allowed to select the kind of employment for the vessel,—*Held*, that this was not such a surrender of control

ment, acquired whatever cause of action existed against the plaintiffs in favor of the payees of the check, yet this judgment should not be disturbed. The Bank did not set up any counter-claims against the plaintiffs, but tried the case simply upon the question of their right to pay this check. Had a counter-claim been interposed, the plaintiffs might have gone into evidence to show that they had a defence to the claim in payment of which they had issued this check, as they stated to the teller of the Bank. As the Bank can yet sue the plaintiffs, if it thinks it has acquired a cause of action by becoming possessed of the check, it will not be prejudiced by the affirmance of this judgment, which, upon the testimony and the course of the trial below, is correct. The objection that the check was not tendered to the Bank was not taken below, and cannot be relied on here; but if the Bank wish it, the check must be taken from the files, and delivered up to it.

I think the judgment should be affirmed.

---

## ROBERT ANNETT *v.* DAVID FOSTER.

Where a vessel was attached to a wharf by a line lying for most of its length beneath the water, and at such a distance from the wharf as to leave ample passage-way between it and the wharf for vessels to pass to and fro, but no person was on deck to loosen the line or warn vessels attempting to pass,—*Held*, negligence which rendered the owners liable for any damages resulting therefrom.

The relation of master and servant between the owner and master of a vessel and the liability of the former, as owner, for negligence in its management does not cease unless the owner has given up all control of the vessel and of her employment, and all immediate and direct interest in the freight earned by her. Hence, where the agreement between the owner and master of a vessel was that the former should make contracts for, and receive the freight, and pay wharfage, and the master should receive a share of the freight money, and pay all other expenses, and be allowed to select the kind of employment for the vessel,—*Held*, that this was not such a surrender of control

Annett v. Foster.

as to make the master owner *pro hac vice*, or relieve the owner of liability for injuries arising from negligence in the management of the vessel.

What acts will divest the owner of his responsibility for the management of a vessel,—considered.

APPEAL by the defendant from a judgment of the District Court for the Third Judicial District.

The action was brought to recover damages for injuries caused to the plaintiff's steamboat, the "Thomas E. Hulse," from a collision with the defendant's schooner "Cataract."

The schooner was lying apparently at anchor opposite the Jane Street pier, and about one hundred yards from the pier to which she was in fact fastened by a line, the line dipping into the water immediately from the pier and the bow of the schooner. The steamboat was passing up between the schooner and the pier, which was testified to be the usual track for her in the then state of wind and tide, and according to the pilot's evidence, the rope was not seen until the boat was too near to stop. She was checked, but was caught by the rope, so as to produce a collision, causing some damage to the steamboat, and causing her to be laid up for repairs for two days. It was testified that no person was on the deck of the schooner when the boat was approaching.

The defendant gave evidence that Nicholas Thompson had control and management of the schooner. She was chartered to him in shares, and he was to victual and man her ; that defendant had nothing to do with her navigation. The schooner was, at the time, carrying brick for one Henry Belfair, under a contract made by defendant himself. Thompson had the privilege, if he did not like the brick trade, to go into any other he thought more profitable. The defendant paid the wharfage, while Thompson paid all other expenses, and he and defendant had a settlement every two trips. On these facts the justice rendered a judgment for the plaintiff for one hundred and fifty-one dollars and thirty-seven cents, from which the defendant appealed.

*Wm. J. Haskett*, for appellant.

*G. P. Andrews*, for respondent.

By the Court.—Daly, F. J.—The evidence intr[...] the plaintiff made out a clear case of the absence of [...] gence on the part of those in charge of the steamboat. [...] in conflict with the testimony produced by the plain[...] tablish co-operating negligence, and the justice hav[...] favor of the plaintiff, his decision upon all facts w[...] conflict is final, and will not be reviewed.

The steamboat was not out of her course. Ther[...] space for her to pass between the schooner and the [...] had several times before gone as close to the dock, [...] so on this occasion to keep fair with the wind and t[...] her speed. It was, according to the testimony of th[...] usual and accustomed course, as the wind and tide t[...] It was an act of negligence to have the schooner [...] the river from three to four hundred yards from [...] with her line attached to the bulkhead, for a t[...] in the water, there was nothing to indicate that [...] thing to obstruct the free passage of vessels in th[...] between the schooner and the wharf. If the p[...] come necessary in consequence of the high stag[...] and the dragging of the schooner's anchor, she sh[...] had some person upon the look-out, either to slacken th[...] to warn vessels approaching not to pass between her[...] bulkhead. As the line which connected her with the [...] was beneath the water, it would naturally be suppos[...] the case in this instance, that she was lying at anch[...] continue lying there, in a river like the Hudson, where[...] boats and vessels of every description are constantly [...] without resorting to any means to indicate that there [...] obstruction to vessels passing between her and the wha[...] providing any way to guard against the occurrence of[...] accident as took place, was an act of negligence.

The agreement which subsisted between the defend[...] the master of the schooner was not of such a charac[...] constitute the latter owner of the vessel *pro hac vic[...]* schooner belonged to the defendant, and he made a [...] with one Belfair to carry brick for a stipulated sum [...] sand, in which service the vessel had been employ[...] time when the accident occurred. The defend[...] the freight for the carriage of the bricks from B[...]

one-half of it to the master and retaining the other half him-
self. The master, out of his half, victualed the vessel, hired
and paid the men, and had exclusive charge of the navigation ;
and the defendant, out of his half, paid the wharfage. The
wear and tear and painting were also, it would seem, paid out
of the captain's share. A settlement was made at the close of
every second trip, and the captain, if he did not like the brick
trade, had the privilege to go into any other he thought more
profitable.

There was not such a parting by the defendant with the con-
trol and management of the schooner and of her earnings as
would make Thompson, the captain, the temporary owner.
The defendant was the owner and the freighter. He made the
contract with Belfair for the carriage of the brick, collected
the freight, and he alone was entitled to receive it in the first
instance. He would be answerable to Belfair in the event of
a failure to deliver the bricks pursuant to the contract; all of
which are determining circumstances to show that he had not
so divested himself of the control and management of the vessel
and of her earnings, as to vest in another the rights and respon-
sibilities of ownership for the time being. "If a case should
occur," said Lord TENTERDEN, in his work upon shipping (p. 57,
8th Lond. ed.), " of an injury done by the negligent or unskill-
ful management of a ship, the possession and control of which
had so completely passed to the charterer that he appointed
the master and crew, and directed not only her destination and
employment, but the mode of her navigation, then, probably
he, and not the absolute owner, would be held responsible
for the misfortune." But this is not such a case. Here the
master of a vessel is selected by the defendant, between whom
and the master an agreement is made to run her upon shares,
but the defendant contracts for her employment, and receives
the freight, which he divides with the master, each of them
bearing a certain proportion of the expenses of running the
vessel. In the well-considered case of *Newberry* v. *Colvin*
(7 Bing., 190 ; 1 Clark & Fin., 283), which in some respects
resembled this, the owner had no immediate interest in the
freight earned, but the whole surplus went to the master, who
had agreed to pay for the time and use of the ship, whether
any freight was earned or not, a stipulated sum, to be com-

puted according to the tonnage of the vessel, which wa[?] [?]
trolling circumstance to show that the vessel wa[?] in th[?] [?] [?]
ployment of the master, and not of the owner. The sam[?] [?]
ture distinguishes the case of *Thompson* v. *Snow* (1 [?].
264), in which the vessel was let to the master on sh[?] [?]
victualing and manning her, paying a portion of th[?] [?]
charges, and yielding to the owners for her hire, a cert[?] [?]
of the net earnings; but in which he had the right t[?] [?]
the vessel as he pleased. In *Lyman* v. *Rodman* (10 Sh[?]. [?],
it is said that the taking of the vessel by the master, his vi[?] [?]
ing and manning her, paying a portion of the port char[?] [?]
having a share of the profits, do not of themselves con[?][?][?]
him the owner *pro hac vice ;* that it is the entire contr[?] [?]
direction of the vessel which he has the power to a[?][?]. [?] [?]
the surrender by the owner of all power over her f[?] th[?] th[?]
being, which will exonerate the owner from lia[?]ility. [?]
was the case of *Webb* v. *Pierce* (1 Curt. C. C. R., 1[?] . [?]
which the master hired the vessel upon shares, un-l[?]r [?] [?]
ment to victual and man her, and employ her in such v[?]y[?]
as he thought best. In *Jones* v. *Blinn* (2 Rich., 47[?]), it [?]
held that the owner is liable, the presumption being tha[?] [?]
vessel is navigated for his benefit; but where it is clea[?][?]
proved that he has no interest in the freight, and that [?][?] [?]
navigated under the entire control, as well as for the exclu[?][?]
benefit, of a third person, such person is *pro ha[?] [?][?][?]* [?]
owner; and in *Arthur* v. *The Schooner Cassius* (2 Story, [?]).
where the vessel was chartered by the master as owner [?]r [?]
certain voyage, and by the terms of the charter party th[?][?]
eral owners were to share the freight with the master, i[?] [?]
held that the general owners were liable as owners f[?] [?]
voyage. These authorities are decisive upon the point ra[?] [?].
The defendant, it is true, testified that Thompson had th[?] [?]
ilege if he did not like the brick trade to go into any oth[?][?] [?]
he thought more profitable; but however that may hav[?] [?]
or whatever may be the exact meaning of this testim[?][?]. [?]
is somewhat loose, the defendant, at the time of th[?] [?]
and for some time before, had contracted for the em[?][?] [?]
of the vessel, and had received and shared in the fr[?][?][?]. [?]
the fact that she was then employed in an enterpri[?] th[?] [?]
ings of which were received by the defendant, and p[?][?][?] [?]

Annett v. Foster.

bly divided between him and Thompson, is sufficient to fix the defendant's liability (*Jones* v. *Sims*, 6 Port., 138).

The defendant selected the master, and if he were a negligent, unskillful, or incompetent officer, he had the right to discharge him, notwithstanding the agreement which existed between them. Whether he engaged him at a stipulated sum, or made an agreement with him to run the vessel upon shares, did not alter their respective relations in this particular, unless the defendant had given up to him, which he did not, all control of the vessel, and of her employment, and all immediate or direct interest in the freight earned by her. On the contrary, he retained and exercised the right to contract for her employment, so that the relation of master and servant was not severed between them. As respects third persons who might sustain injury from the unskillful or negligent management of the vessel, he stood in the relation of owner, and Thompson in that of master; and it is well settled that an owner is, under such circumstances, responsible for an injury arising from the negligence or want of skill of those who are entrusted with the management of the vessel (*Duser* v. *Murgatroyd*, 1 Wash. C. C. R., 13; *Stone* v. *Keatland*, ib., 142; *The Rebecca*, Ware's R., 188; Abbott on Shipping, 228, 8th Lond. ed.).

The judgment of the justice must be affirmed, but as the question is an important one, and as both parties consent, the case, if desired, may be taken to the Court of Appeals.

Judgment affirmed.